OPINION
{¶ 1} This matter is before the Court on the Notice of Appeal of Mandale Bates, filed August 15, 2005. A Clark County Grand Jury indicted Bates on May 23, 2005, on one count of aggravated burglary, in violation of R.C. 2911.11(A)(2), one count of receiving stolen property, in violation of R.C. 2913.51(A), one count of felonious assault with a firearm, in violation of R.C.2903.11(A)(1), one count of failure to comply with an order or signal of a police officer, in violation of R.C. 2921.331(B), and one count of having a weapon under disability, in violation of R.C. 2923.13. On July 27, 2005 Bates filed a Motion for Separation, asking the court to sever the weapons under disability charge, and on August 1, 2005, the court overruled the Motion.
 {¶ 2} A trial was held on August 3-4, 2005. A jury found Bates not guilty of aggravated burglary, guilty of receiving stolen property, a first degree misdemeanor, guilty of felonious assault with a firearm, a felony of the second degree, and guilty of having a weapon under disability, a felony of the third degree. The charge of failure to comply with an order or signal of a police officer was dismissed. The trial court sentenced Bates to six months on the receiving stolen property charge, eight years on the felonious assault charge, with an additional three years for the firearm specification, and five years for having a weapon while under disability. The court ordered that the sentences for felonious assault and having a weapon under disability be served consecutively, and it also ordered that the sentence for receiving stolen property be served concurrently with the other sentences.
 {¶ 3} The events giving rise to this matter began on May 17, 2005, at the residence of Chad Foland, Jamie Cromwell and their three children, located at 2323 Irwin Drive, in Clark County, Ohio. Foland was playing a video game in the living room, and Cromwell was resting on a loveseat when a masked man with a gun came through their back door. Foland fled to the bathroom, tried to slide down the laundry shoot, and then climbed out the bathroom window. Foland ran to the home next door and called 911. Cromwell remained in the living room. A second man with a gun entered the home through the back door. The first man initially chased Foland, and when he was unable to find him, the man returned to the living room. The second man put a blanket over Cromwell's head. The first man asked Cromwell "where all the weed was," "where all the money was" and "where's your gun." Cromwell responded that she did not have any weed, money or a gun, and the first man lifted up the blanket and struck her head with his gun.
 {¶ 4} When the police responded to the Irwin Drive address, both suspects fled in a car. Officer Dan Harris pursued the vehicle. The men soon abandoned the vehicle and fled on foot. They left the car in gear, and it struck an embankment. Officer Harris approached the car and located several items, including a handgun on the floorboard of the passenger seat, a cooler and a trash bag in the back seat. Inside the cooler were numerous items removed from the Irwin Drive residence, including personal identifications, jewelry, a man's wallet, and a baggie of marijuana. Police also recovered a digital scale and baggie of cocaine from inside the cooler. A baggie of marijuana was found in the trash bag. Foland admitted that one of the baggies of marijuana was his, but he denied that the cocaine and scale belonged to him.
 {¶ 5} Bates asserts six assignments of error.
 {¶ 6} Bates' first assignment of error is as follows:
 {¶ 7} "APPELLANT'S DEFENSE WAS PREJUDICED BY WITNESS TESTIMONY TAINTED BY AN IMPROPERLY SUGGESTIVE IDENTIFICATION"
 {¶ 8} Foland and Cromwell identified Bates at trial. Cromwell testified that she had seen Bates once before. She stated that on the day before Mother's Day, as she was letting her puppy outside, she "caught him in the middle of my backyard." She stated that she subsequently filed a police report. Regarding the incident at issue, Cromwell testified that she got a good look at Bates when he lifted the towel and hit her with the gun. She also testified as follows:
 {¶ 9} "Q. * * * you said [Bates] had on a mask covering his face. How can you identify him today?
 {¶ 10} "A. Because he came back into my house and I looked right at him.
 {¶ 11} "Q. He came back into your house?
 {¶ 12} "A. Yes.
 {¶ 13} "Q. Okay, when was that?
 {¶ 14} "A. When the cops came, they both ran out —
 {¶ 15} "Q. Okay.
 {¶ 16} "A. And I thought they were gone and when I looked up, [Bates was] sitting in my kitchen aiming his gun at me.
 {¶ 17} "Q. And he didn't have his mask on at that time?
 {¶ 18} "A. I'm not sure. I just know I looked right dead in his face."
 {¶ 19} Cromwell also testified that the prosecutor showed her a photo of Bates a week before trial and asked Cromwell who he was. The prosecutor also showed her pictures of the other defendant, Adonte Cherry and "like six other people."
 {¶ 20} Foland based his identification of Bates on a split second, over-the-shoulder glance into Bates' eyes as Foland fled. He also testified that he was shown a photo of Bates at the prosecutor's office. The trial court asked Bates' counsel repeatedly if he wanted to have Foland's identification stricken, but, perhaps for tactical reasons, Bates did not object to Foland's identification of him. Any objection to Foland's identification accordingly has been waived.
 {¶ 21} Bates objected to Cromwell's identification of him on the basis that "[n]one of that stuff she testified to is in the report about him coming back in the house and pointing the gun at her or being in her backyard * * *." In his Brief, Bates argues that "the danger of misidentification is increased when only a single photograph is used in an identification * * *." The trial court determined that "the fact that some of those things are not in this report and the fact that she did see photographs * * * goes to the weight of her identification and not to the admissibility." The trial court instructed the jury on weighing the testimony of identifying witnesses.
 {¶ 22} "`To warrant suppression of identification testimony, the accused bears the burden of showing that the identification procedure was unnecessary and so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification; and that the identification itself was unreliable under the totality of the circumstances. (Internal citations omitted.) The United States Supreme Court has acknowledged that the danger of an incorrect identification is increased where only one photograph is displayed to a witness. (Internal citations omitted.) Even where a photographic identification procedure is found to have been impermissibly suggestive, however, it does not invariably lead to the conclusion that the defendant's due process rights have been violated. Instead, the question becomes whether under the totality of the circumstances the identification was reliable even though the identification procedure was suggestive." Statev. Padgett, (June 30, 2000), Greene App. No. 99 CA 87.
 {¶ 23} "Whether an identification is reliable can be determined by assessing the likelihood of misidentification given the circumstances surrounding the identification. * * * [t]he Supreme Court articulated five factors to be considered in making such an evaluation: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation or identification; and (5) the length of time between the crime and the confrontation or identification." Id.
 {¶ 24} We initially note our disapproval of the practice of showing a witness a single photograph of a suspect. State v.Carruth, Montgomery App. No. 19997, 2004-Ohio-2317. However, "numerous courts have held that a witness's opportunity for observation during the crime is an independent source from the pretrial identification." State v. Goodwin (July 13, 1983), Montgomery App. No. 7978. Cromwell testified that she had the opportunity to view Bates when he removed the blanket from her head and hit her with his gun. She also stated that she "looked right dead in his face" later in the kitchen. During the incident, Bates assaulted her and later pointed a gun directly at her, so we are satisfied that Cromwell's attention was riveted upon him. There is no testimony in the record regarding Cromwell's prior description of Bates. Cromwell, however, saw Bates in her backyard also, and she recognized him as the same man who later victimized her inside her home. Cromwell identified Bates at trial with a high level of certainty. As to the other defendant, in contrast, Cromwell admitted that she could not identify Cherry, stating, "he looks different than what he did in the picture." Cromwell was assaulted on May 17, 2005, and she viewed the photo of Bates in late July of the same year, a few days before trial. Under the totality of the circumstances, the trial court did not err in admitting Cromwell's identification of Bates, and, as the trial court noted, Bates' objections go to the weight and believability and not the admissibility, of the identification. Bate's first assignment of error is overruled.
 {¶ 25} Bates' second assignment of error is as follows:
 {¶ 26} "THE TRIAL COURT ABUSED ITS DISCRETION BY ADMITTING EVIDENCE WHICH WAS NOT PROPERLY DISCLOSED TO DEFENSE COUNSEL"
 {¶ 27} At trial, Foland testified that the first man to enter the house was wearing a blue bandana as a mask. Cromwell testified that the second man was wearing a cream colored bandana. Counsel for Cherry asked Officer Dan Harris on cross examination if a bandana was found in the car. Harris referred to the property sheet, and then testified that a camouflage bandana was found and received into property. During a sidebar at trial, counsel for Bates indicated to the court that he "got the property receipt and there was no listing of the bandana." Bates' counsel then moved to strike mention of the bandana because it was not included in the discovery provided by the State. The trial court noted that the State did not deliberately withhold the bandana, that mention of it occurred on cross examination, and the court refused to strike Harris' testimony regarding the bandana.
 {¶ 28} Bates argues that had defense counsel "been notified of the existence of the bandana DNA testing could have been done on it to help prove the innocence of Appellant." Bates also argues that, because the bandana was not blue, it "could have been used by defense in its cross examination of the witnesses."
 {¶ 29} A trial court does not abuse its discretion in admitting evidence that was not properly disclosed under Crim. R. 16 where the record fails to disclose "(1) a willful violation of the rule, (2) that foreknowledge would have benefited [sic] the accused in the preparation of his or her defense, or (3) that the accused was unfairly prejudiced." State v. Scudder (1994),71 Ohio St.3d 263, 269, 643 N.E.2d 524.
 {¶ 30} There is no evidence in the record that the State willfully withheld the bandana. The prosecutor represented to the court that the State provided the defense with everything the prosecution had in discovery, and Bates does not argue that the State deliberately violated Crim. R. 16. Even if Bates were aware of the bandana, and DNA testing were performed, the presence of any DNA other than Bates', or the absence of Bates' DNA, would not be exculpatory, because Foland testified that Bates wore a blue bandana. Further, Foland's testimony addressed the aggravated burglary charge of which Bates was found not guilty, making Foland's identification, and the potential value of any cross examination of him regarding the bandana, irrelevant on appeal. There being no unfair prejudice to Bates, and no abuse of discretion in the trial court's admitting the testimony regarding the camouflage bandana, Bates' second assignment of error is overruled.
 {¶ 31} Bates' third assignment of error is as follows:
 {¶ 32} "THE TRIAL COURT ABUSED ITS DISCRETION IN OVERRULING DEFENSE COUNSEL'S MOTION TO SEVER THE WEAPONS UNDER DISABILITY CHARGE APPELLANT WAS FACING."
 {¶ 33} "A motion for severance of counts due to prejudicial misjoinder is waived unless it is renewed at the close of the state's case or at the conclusion of the evidence." State v.Rutledge (June 1, 2001), Montgomery App. No. 18462 (affirming trial court's denial of appellant's motion to sever counts of possession of drugs and tampering with evidence from a count of having a weapon under disability). The record reveals that Bates did renew his motion at the close of the State's case, and he accordingly preserved his right to raise the issue on appeal.
 {¶ 34} "Two or more offenses may be charged in the same indictment * * * in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Crim. R. 8. "It is well-established that the law favors joinder because the avoidance of multiple trials conserves time and expense and minimizes the potentially incongruous outcomes that can result from successive trials before different juries." Rutledge. "If it appears that a defendant or the state is prejudiced by a joinder of offenses * * *, [however] the court shall order an election or separate trial of counts * * *." Crim.R. 14.
 {¶ 35} "To affirmatively show that his rights have been prejudiced, the defendant `must furnish the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial, and he must demonstrate that the court abused its discretion in refusing to separate the charges for trial." Rutledge (internal citations omitted).
 {¶ 36} Bates argues that the "refusal of the trial court to sever the weapons under disability charge necessitated introduction of a prior felonious assault conviction to prove the weapons under disability charge," and evidence of the prior conviction "improperly influenced the jury in weighing the evidence of the assault charges in the present case * * *."
 {¶ 37} "The state can negate the defendant's claim of prejudice in two different ways. Under the first method, referred to as the `other acts' test, the state must demonstrate that the evidence to be introduced at the trial of one offense would also be admissible at the trial of the other severed offense under the `other acts' portion of Evid. R. 404(B). (Internal citations omitted). Under the second method, called the `joinder test,' `the state is not required to meet the stricter `other acts' admissibility test, but is merely required to show that evidence of each crime joined at trial is simple and direct.' (Internal citations omitted). The purpose of the `joinder test' is to prevent the jury from confusing the offenses or from improperly cumulating the evidence of the various crimes. (Internal citations omitted). The `joinder test' `focuses on whether the trier of fact is likely to consider evidence of one [offense] as corroborative of the other.'" (Internal citations omitted). Id.
 {¶ 38} The state argues that "the evidence for these offenses was simple and direct." We agree. As to the felonious assault with a firearm offense, Cromwell testified that Bates carried a black gun during the incident. She identified Exhibit 3, a black gun, as the gun Bates pointed at her and used to strike her. As to the count of having a weapon under disability, Ronald Vincent, the Clerk of Courts for Clark County, presented Bates' judgment entry of conviction, in case number 2001 CR 95, on a charge of felonious assault. Christopher Schultz, a deputy sheriff for Clark County also identified Bates as the defendant in case number 2001 CR 95. We cannot conclude that the jury was likely to be improperly influenced by evidence of Bates' earlier conviction and accordingly more likely to believe him guilty of the assault charge against him in the current matter. The simple and direct nature of the witnesses' testimony regarding each offense negates Bates' assertion of prejudice. In other words, the trial court did not abuse its discretion in overruling Bates' motion to sever. Bates' third assignment of error is overruled.
 {¶ 39} Bates' Fourth assignment of error is as follows:
 {¶ 40} "APPELLANT'S CONVICTION OF FELONIOUS ASSAULT AND THE OTHER CHARGES WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE"
 {¶ 41} "To determine whether a conviction is against the manifest weight of the evidence: the court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against conviction." Rutledge (internal citations omitted).
 {¶ 42} A total of eight witnesses testified at trial. In addition to Foland, Cromwell, Harris, Vincent and Schultz, Frank Porter, Communications Manager for the City of Springfield, Brett Bauer, a patrolman for the City of Springfield Police Division, and Timothy Sheppard, a forensic criminalist with the City of Springfield also testified. Porter authenticated the tape of Foland's 911 call. Bauer was the first officer to respond to the residence following the 911 call, and he photographed the scene. Sheppard analyzed the drugs removed from the car and tested the black gun for operability.
 {¶ 43} Having reviewed the entire record, weighing all of the evidence and the reasonable inferences therefrom, and having considered the credibility of the witnesses, we cannot say that the jury lost its way in finding Bates guilty of receiving stolen property, guilty of felonious assault with a firearm and guilty of having a weapon under disability. Cromwell was certain in her identification of Bates, whom she viewed directly and whom she had seen before in her yard. Bates was apprehended after fleeing the car which contained items taken from Foland's and Cromwell's home. He was under disability at the time of his arrest. Having concluded that Bates' convictions were not against the manifest weight of the evidence, Bates' fourth assignment of error is overruled.
 {¶ 44} We will consider Bates' fifth and sixth assignments of error together. They are as follows:
 {¶ 45} "THE TRIAL COURT ABUSED ITS DISCRETION IN IMPOSING MAXIMUM SENTENCES ON APPELLANT."
 {¶ 46} and
 {¶ 47} "THE TRIAL COURT ABUSED ITS DISCRETION IN IMPOSING CONSECUTIVE SENTENCES ON APPELLANT."
 {¶ 48} The Ohio Supreme Court determined that R.C.2929.14(C), 2929.14(E)(4) and 2929.41(A), pursuant to which Bates was sentenced, are unconstitutional because they require judicial fact-finding before maximum or consecutive sentences are imposed, in violation of a defendant's Sixth Amendment right to a jury trial. State v. Foster, 109 Ohio St.3d 1, 845 N.E.2d 470,2006-Ohio-856. The Foster court severed the unconstitutional provisions from the felony sentencing scheme, and the Foster
decision requires resentencing for cases pending on direct review. Id. Since Bates received maximum consecutive sentences for felonious assault with a firearm and for having a weapon under disability, resentencing is required. Reversed and remanded for resentencing.
 {¶ 49} Judgment affirmed in part, reversed in part and remanded for resentencing.
Wolff, J. and Fain, J., concur.
(Hon. George M. Glasser retired from the Sixth District Court of Appeals sitting by assignment of the Chief Justice of the Supreme Court of Ohio).