[Cite as *State v. McComb*, 2017-Ohio-4010.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 26884 |
| | : | |
| v. | : | Trial Court Case No. 2015-CR-1152/1 |
| | : | |
| DAVION R. MCCOMB | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 26th day of May, 2017.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

ROBERT ALAN BRENNER, Atty. Reg. No. 0067714, 120 West Second Street, Suite 706, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-appellant, Davion R. McComb, appeals from his conviction in the Montgomery County Court of Common Pleas after he was found guilty of multiple counts of aggravated robbery, felonious assault, grand theft of a firearm, and having a weapon while under disability. In support of his appeal, McComb challenges the trial court's decision overruling his motion to suppress and his motion for separate trials. McComb also contends that all of his convictions were against the manifest weight of the evidence and that his conviction for grand theft of a firearm was not supported by sufficient evidence. As a supplemental argument, McComb contends that in light of the Supreme Court of Ohio's recent decision in *State v. Hand*, 149 Ohio St.3d 94, 2016-Ohio-5504, 73 N.E. 3d 448, the trial court erred in imposing mandatory prison terms for a portion of his offenses. McComb further contends that the holding in *Hand* renders R.C. 2923.13(A)(2), the statute governing the offense of having weapons while under disability, unconstitutional. For the reasons outlined below, the judgment of the trial court will be affirmed in part, reversed in part, and the matter will be remanded for resentencing.

**Facts and Course of Proceedings**

{¶ 2} On May 13, 2015, the Montgomery County Grand Jury returned an indictment alleging that on April 7, 2015, McComb committed single counts of aggravated robbery, felonious assault, grand theft of an automobile, grand theft of a firearm, and having a weapon while under disability. The indictment further alleged that on April 16, 2015, McComb committed two additional counts of aggravated robbery and one count of having a weapon while under disability. All of McComb's charges included a three-year

firearm specification, with the exception of the two charges for having a weapon while under disability.

**{¶ 3}** After pleading not guilty to all the charges, McComb filed a motion to suppress two eyewitness' photographic identification of him as one of the individuals who committed the April 7, 2015 offenses. McComb also filed a motion to have the April 7, 2015 charges tried separately from the April 16, 2015 charges. The trial court overruled both motions.

**{¶ 4}** Thereafter, the matter proceeded to a jury trial on all charges, except for the two charges alleging that McComb had a weapon while under disability. McComb waived a jury trial for the weapons under disability charges, as it was agreed that the trial court would render a verdict based on the evidence presented to the jury. The following is a summary of the evidence presented at trial.

*Events Leading to April 7, 2015 Charges*

**{¶ 5}** At 2:00 a.m. on the morning of April 7, 2015, McComb and his codefendant, Londell Johnson, approached Tyree Martin, who was standing on the front porch of a residence located at 927 West Riverview Terrace in Dayton, Ohio. Martin was at the residence to pick up his roommate, Joshua Jones, who was visiting his girlfriend, Rolonda Reiter. It is undisputed that Reiter is Johnson's sister. While Martin was waiting for Jones to come outside, McComb and Johnson came from the right side of the residence and asked what Martin wanted. Johnson then patted Martin down and asked what was in his pockets.

**{¶ 6}** When Jones came outside on the porch with Reiter, he saw McComb and Johnson approach Martin. McComb then searched Jones and took Jones's I.D., money,

and cellphone. While on the porch, both Martin and Jones noticed that McComb had a gun in his hand.

{¶ 7} During the encounter, Martin was able to discretely dial 9-1-1 on his cellphone. However, Johnson heard the 9-1-1 operator on the cellphone ask if there was an emergency, and upon hearing the operator, Johnson told McComb to shoot Martin in the face. Martin then pushed Johnson and took off running toward his car. Johnson and McComb chased Martin, and Martin retrieved a gun that was in the car's console. When Johnson reached Martin's car, Johnson reached in the vehicle through the driver's side door and attempted to take the gun from Martin. After a struggle, Martin managed to get the gun away from Johnson and turned to fire it at McComb who was firing shots at him. However, Martin could not get his gun to fire in the midst of McComb's shooting, so Martin dropped the gun in the street and fled from the scene.

{¶ 8} Jones was standing on the front porch with Reiter as the shots were being fired. From the porch, Jones saw Johnson pick up Martin's gun and drive off in Martin's car while McComb went back toward the porch. When Jones saw that McComb was coming back toward the porch, Jones ran through the house and out the back door as McComb chased him. As he was being chased, Jones heard another gunshot.

{¶ 9} After fleeing from the scene, Martin and Jones went to a nearby park and flagged down two police cruisers. When they returned to the scene with the police, Martin's car and gun were both missing. However, the investigating officers discovered two shell casings in the street where Martin claimed shots were fired at him.

{¶ 10} Two days later, on April 9, 2015, Martin and Jones were approached by McComb and Johnson while they were eating at a Buffalo Wild Wings restaurant in

Dayton. During the encounter, Martin and Jones recognized McComb as the individual who had fired shots at Martin two days earlier. At the restaurant, McComb showed that he had a gun underneath his sweatshirt and threatened Martin. In addition, both McComb and Johnson told Martin that he could have his car back for $500 or both his car and his gun for $700. The following day, Martin called the lead detective investigating his case, Detective Deborah Ritchey, to report what had happened at the restaurant. However, at the time, Martin did not know McComb's name.

{¶ 11} On April 16, 2015, Martin saw McComb and Johnson's photographs on a televised newscast regarding their arrest for a different, unrelated robbery. After seeing their photographs, Martin immediately recognized McComb as the individual who fired shots at him on April 7th and who approached him at Buffalo Wild Wings on April 9th. The day after the newscast, Martin contacted Detective Ritchey again and informed her of the newscast and identified McComb as the individual who fired shots at him. After receiving this call, Detective Ritchey arranged for Martin and Jones to come to the police station on April 20, 2015, and review a photospread of suspects. After the photospread was administered, both Martin and Jones positively identified McComb as the April 7th shooter. The photograph of McComb used in the photospread was the same photograph that Martin saw on the newscast.

*Events leading to April 16, 2015 Charges*

{¶ 12} On the morning of April 16, 2015, McComb and Johnson were parked outside Precision Auto Tune, a body shop located in Dayton, Ohio, when Robbie Deaton and his stepfather, Joshua Howard, pulled up next to them and asked if they were interested in purchasing a home theater system. Deaton and Howard are in the business

of selling home theater equipment for Queen City Theater Design and they travel to various locations in Ohio and Kentucky to make sales.

{¶ 13} After speaking with Howard, Johnson and McComb agreed to purchase two surround sound speakers for $150 each. Upon making their selection, Johnson told Howard and Deaton that he needed go to his house to get money to pay for the speakers. Deaton and Howard then followed McComb and Johnson as they drove to an apartment complex approximately 10 minutes away located on Dayview Circle.

{¶ 14} When they reached the apartment complex, Deaton remained in the driver's seat of their vehicle while Howard walked to the back of the vehicle to grab the box of equipment that McComb and Johnson had agreed to purchase. McComb and Johnson then got out of their white SUV and walked up to Howard, who opened the box of equipment to show it to McComb and Johnson. McComb then came up to Deaton at the driver's side of the vehicle, pointed a gun at his face, and said: "Turn the car off and give me the key or I'm going to kill you." Trial Trans. Vol. II (Sept. 22, 2015), p. 334. After Deaton complied with McComb's demand, McComb opened the driver's side door, pressed his gun against Deaton's chest, searched Deaton's pockets, and took his cellphone. McComb repeatedly asked Deaton "where's the money at?" *Id.* at p. 336. In response, Deaton told McComb he had no money.

{¶ 15} Meanwhile, Howard was struggling with Johnson who had also pulled out a gun. Johnson fired a warning shot at Howard to stop him from struggling as he tried to search his pockets. Upon hearing the gunshot and Johnson's request for help, McComb ran back to assist Johnson in taking $300 from Howard. McComb then held Howard by his shirt collar, with his gun in his other hand, while Johnson loaded the home theater

equipment into their SUV. Johnson and McComb then placed Howard in the vehicle with Deaton, threw the vehicle's keys in a field, and told Deaton and Howard to never return to Dayton. As McComb and Johnson drove away, Johnson fired two gunshots at their vehicle. When McComb and Johnson were gone, Howard went to a nearby house to call 9-1-1.

{¶ 16} After the robbery was reported, police officers went to Precision Auto Tune to review the store's surveillance video. As the police officers were leaving the store, they saw McComb and Johnson drive by in their white SUV. One of the officers attempted to initiate a traffic stop, but McComb and Johnson did not comply. A 30-minute-high-speed chase then ensued.

{¶ 17} During the chase, McComb jumped out of the vehicle and took off running, but was ultimately apprehended. The officer who apprehended McComb found Deaton's cell phone in his pocket and $356 in cash. Shortly thereafter, Johnson was also apprehended and taken into custody. When the police searched the white SUV that Johnson and McComb were riding in, they discovered the keys to Tyree Martin's vehicle in the glove compartment. The police also recovered two shell casings and a bullet on the ground where the shots were fired at Dayview Circle.

{¶ 18} After trial, the jury found McComb guilty on all counts and specifications. The trial court also found McComb guilty on both counts of having a weapon while under disability. Following the verdicts, McComb moved for a Crim.R. 29 acquittal for all of his convictions, primarily focusing on the charges for grand theft of an automobile and grand theft of a firearm. After considering the matter, the trial court granted an acquittal on the grand theft of an automobile charge. McComb was then sentenced to an aggregate

prison term of ten years.

{¶ 19} Thereafter, McComb filed a notice of appeal from his conviction and subsequently filed an appellate brief on June 15, 2016, raising four assignments of error for this court's review. After the State filed its appellate brief, on January 26, 2017, this court issued a briefing order that invited the parties to file simultaneous, supplemental briefs discussing the impact of the Supreme Court of Ohio's recent decision in *State v. Hand*, 149 Ohio St.3d 94, 2016-Ohio-5504, 73 N.E. 3d 448, if any, on McComb's appeal. In response, McComb filed a supplemental brief raising two additional assignments of error. The State then filed a brief addressing McComb's supplemental assignments of error. For purposes of clarity, we will address McComb's supplemental assignments of error first and then proceed to discuss his original four assignments of error.

**Supplemental Assignments of Error**

{¶ 20} McComb's Supplemental Assignments of Error are as follows:

I.    THE TRIAL COURT ERRED WHEN IT SENTENCED MCCOMB TO MANDATORY PRISON TERMS ON COUNTS I, II, VI, AND VIII [aggravated robbery and felonious assault].

II.    MCCOMB'S CONVICTIONS FOR COUNTS III AND X [having weapons while under disability] MUST BE REVERSED BECAUSE THEY ARE BASED UPON R.C. 2923.13(A)(2) WHICH IS UNCONSTITUTIONAL BECAUSE IT VIOLATES THE DUE PROCESS CLAUSES OF ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION AND THE FOURTEENTH AMENDMENT TO THE

UNITED STATES CONSTITUTION.

{¶ 21} Under his supplemental assignments of error, McComb contends that in light of the Supreme Court of Ohio's holding in *Hand,* the trial court erred in imposing mandatory prison terms for his three counts of aggravated robbery and his single count of felonious assault. McComb also contends that *Hand* renders R.C. 2923.13(A)(2), the statute governing the offense of having weapons while under disability, unconstitutional because it violates his due process rights.

{¶ 22} In *Hand*, the Supreme Court of Ohio held that it is unconstitutional to use a juvenile adjudication as the equivalent of an adult conviction to enhance a penalty for a later crime, because, unlike an adult conviction, a juvenile adjudication does not involve the right to a trial by jury. *Hand*, 149 Ohio St.3d 94, 2016-Ohio-5504, 73 N.E. 3d 448, ¶ 38. In so holding, the court struck down R.C. 2901.08(A), a statute which specifically provided that a prior "adjudication as a delinquent child or as a juvenile traffic offender is a conviction for a violation of the law or ordinance for purposes of determining the offense with which the person should be charged and, if the person is convicted of or pleads guilty to an offense, the sentence to be imposed[.]" *Id.* at paragraph one of the syllabus and ¶ 9. Therefore, the Supreme Court of Ohio made it clear in *Hand* that "a juvenile adjudication is not a conviction of a crime and should not be treated as one." *Id.* at ¶ 38.

{¶ 23} The State concedes, and we agree, that pursuant to *Hand*, the trial court erred in imposing mandatory prison terms for McComb's three first-degree-felony counts of aggravated robbery and for his second-degree-felony count of felonious assault. The record indicates that the trial court imposed mandatory prison terms for these offenses pursuant to R.C. 2929.13(F)(6), which provides for a mandatory sentence when a

defendant is convicted of a first-or second-degree felony and "previously was convicted of or pleaded guilty to * * * any first or second degree felony[.]"

{¶ 24} Prior to trial, the parties stipulated that McComb had been adjudicated a delinquent child for the commission of an offense that would have been a felony if committed by an adult, i.e., aggravated robbery, a first-degree felony. The State concedes that the trial court treated McComb's juvenile adjudication for aggravated robbery as a previous conviction for purposes of applying mandatory prison terms under R.C. 2929.13(F)(6), as McComb had no other prior criminal history. Because the trial court treated McComb's juvenile adjudication as a prior conviction to enhance his prison sentence under R.C. 2929.13(F)(6), we agree that the imposition of mandatory prison terms for the offenses at issue run afoul of *Hand*. Accordingly, McComb's first supplemental assignment of error is sustained.

{¶ 25} We do not, however, find that the Supreme Court of Ohio's holding in *Hand* renders the weapons under disability statute McComb was convicted under, R.C. 2923.13(A)(2), unconstitutional on due process grounds. R.C. 2923.13(A)(2) provides, in relevant part, that:

> [N]o person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * the person is under indictment for or has been convicted of any felony offense of violence *or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence.*

(Emphasis added.)

{¶ 26} Pursuant to the statute, a violation of R.C. 2923.13(A)(2) requires an

offender to either have a prior conviction *or* a prior juvenile adjudication. Unlike the statute that was struck down in *Hand*, the statute at issue, R.C. 2923.13(A)(2), does not treat a prior juvenile adjudication as a conviction. Rather, a prior juvenile adjudication and conviction are treated as alternative elements necessary to establish the offense of having weapons while under disability. *Hand* does not ban the use of a prior juvenile adjudication as an element of an offense; rather, *Hand* bans the use of a juvenile adjudication to enhance a penalty by treating the adjudication as an adult conviction. *Hand* at ¶ 37 (holding "it is fundamentally unfair to treat a juvenile adjudication as a previous conviction that enhances either the degree of or the sentence for a subsequent offense committed as an adult").

{¶ 27} In *State v. Hudson*, 7th Dist. Mahoning No. 15 MA 0134, 2017-Ohio-645, the Seventh District Court of Appeals addressed the same due process argument raised by McComb with respect to R.C. 2923.13(A)(2), and declined to extend the holding in *Hand* to R.C. 2923.13(A)(2) based on the following reasoning:

> There is no indication the Supreme Court would extend the holding in *Hand* to the statute defining [the having weapons while under disability] offense, and this court refuses to do so. The case at bar does not involve increasing the degree of an offense or enhancing a penalty for an offense. Rather, a juvenile with a prior adjudication for an offense that would be a felony of violence if committed by an adult is prohibited from carrying a firearm until the disability is removed by operation of law or legal process. Applying *Hand* in such a case would essentially mean a prior juvenile offender could not be prohibited from carrying a firearm (after his community control is over).

*Id.* at ¶ 51. *Accord State v. Carnes*, 2016-Ohio-8019, ___ N.E.3d ___, ¶ 15 (1st Dist.) (finding the holding in *Hand* is limited to banning the use of a juvenile adjudication to enhance punishment and is irrelevant to establishing the disability element of appellant's having weapons while under disability charge).

{¶ 28} For the foregoing reasons, we agree that the holding in *Hand* does not apply to R.C. 2923.13(A)(2); accordingly, McComb's second supplemental assignment of error is overruled.

### First Assignment of Error

{¶ 29} McComb's First Assignment of Error is as follows:

THE TRIAL COURT ERRED BY OVERRULING MCCOMB'S MOTION TO SUPPRESS THE EYEWITNESS IDENTIFICATIONS.

{¶ 30} Under his First Assignment of Error, McComb contends that the trial court should have suppressed the April 20, 2015 pretrial photographic identification of him by Martin and Jones. Specifically, McComb argues that the photospread identification procedure used by the investigating detective was impermissibly suggestive so as to create a substantial likelihood of misidentification.

{¶ 31} On a motion to suppress identification testimony, "the accused bears the burden of showing that the identification procedure was 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification' and that the identification itself was unreliable under the totality of the circumstances." *State v. Sherls*, 2d Dist. Montgomery No. 18599, 2002 WL 254144, *2 (Feb. 22, 2002), quoting *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

**{¶ 32}** If "the defendant shows that the pretrial identification procedure was unduly suggestive, the court must then consider whether the identification, viewed under the totality of the circumstances, is reliable despite the suggestive procedure." (Citation omitted.) *State v. Moody*, 2d Dist. Montgomery No. 26926, 2016-Ohio-8366, ¶ 12. In determining whether the identification itself was reliable under the totality of the circumstances, courts have considered the witness' opportunity to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.[1] *Id.*, citing *Neil* at 199-200 and *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) and *State v. Chaffin*, 2d Dist. Montgomery No. 25220, 2014-Ohio-2671, ¶ 16. "[R]eliability is the linchpin in determining the admissibility of identification testimony[.]" *Manson* at 114. Therefore, even if the identification procedure is suggestive, the subsequent identification is still admissible as long as it is reliable. *State v. Moody*, 55 Ohio St.2d 64, 67, 377 N.E.2d 1008 (1978), citing *Manson* at 109.

---

[1] At footnote 3 in *Moody*, 2d Dist. Montgomery No. 26926, 2016-Ohio-8366, we stated the following regarding the factors in *Neil*:

> We have previously noted that several factors identified in *Neil* may bear reconsideration in light of the significant advancement of scientific understanding of memory. *See State v. Frazier*, 2016-Ohio-727, 60 N.E.3d 633, ¶ 18, fn. 1 (2d Dist.). For example, *Neil* and *Manson* direct courts to consider the witness's degree of certainty in the identification, yet studies have repeatedly shown little relationship between certainty and accuracy. Nonetheless, as an intermediate court of appeals, this court must continue to follow the factors articulated in *Neil* and *Manson*, as required by Ohio Supreme Court precedent. *See, e.g., State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 25 (considering the *Manson* factors in determining reliability of identification); *State v. Keith*, 79 Ohio St.3d 514, 684 N.E.2d 47 (1997).

{¶ 33} "We review a trial court's refusal to suppress a pretrial identification for an abuse of discretion." *Moody*, 2d Dist. Montgomery No. 26926, 2016-Ohio-8366 at ¶ 14, citing *State v. Wilson*, 2d Dist. Montgomery No. 22624, 2009-Ohio-1038, ¶ 19.

{¶ 34} As previously noted, the pretrial identification procedure at issue is the photospread that was administered to Martin and Jones on April 20, 2015. After the photospread was administered, both Martin and Jones identified McComb as the suspect who fired shots at Martin on April 7, 2015. The photospread shown to each of the witnesses contained a grid of the same six photographs of individuals, including McComb, with the photographs arranged in a different order. An impartial detective who was not involved in the case was asked by the investigating detective, Detective Ritchey, to administer the photospread to each witness. The witnesses were placed in separate areas of the police station before being administered the photospread. After being administered the photospread, Martin and Jones quickly identified McComb as the suspect who fired shots at Martin.

{¶ 35} At the suppression hearing, Detective Ritchey testified that before the April 20, 2015 photospread was administered, Martin had called her on April 17, 2015, and advised her that he recognized McComb as the suspect who fired shots at him after seeing a photograph of McComb and Johnson on a televised newscast regarding the April 16, 2015 robbery. Ritchey testified that prior to the newscast, Johnson had been identified as one of the suspects in the April 7th robbery, but that Martin and Jones were unable to identify the second suspect who had fired shots at Martin. However, when Martin called her on April 17, 2015, he advised her that he saw McComb's picture on the newscast and recognized him as the second suspect. Ritchey also testified that after

Martin called her with this information, she arranged for Martin and Jones to come to the police station for purposes of administering the photospread at issue. It was Ritchey's understanding that prior to their meeting, Martin had used a website to show Jones the photograph of McComb from the newscast.

{¶ 36} McComb claims the photospread identification procedure used was impermissibly suggestive because the picture of him used in the photospread was the same picture that Martin and Jones had seen on the newscast and internet. As a result, McComb claims the photospread was reduced to Martin and Jones merely matching his picture with the photograph they had previously seen.

{¶ 37} The State refutes any suggestiveness by citing a similar case, *State v. Griffin*, 8th Dist. Cuyahoga No. 49114, 1985 WL 6853 (June 13, 1985). In *Griffin*, the defendant robbed a drug store and was later arrested on unrelated charges. The defendant's picture was shown on a local newscast and the pharmacist of the drug store, who previously could not identify the defendant, immediately recognized the defendant's picture on the newscast and notified the police. The pharmacist was thereafter shown a photospread and was able to identify the defendant. *Id.* at *1. The defendant argued the identification was suggestive because the pharmacist was shown the same picture that he saw during the newscast. *Id.* at *2. The Eighth District disagreed noting:

> We find nothing "impermissibly suggestive" about the photographic array conducted on May 17, 1983. The pharmacist identified the appellant on April 22, 1983 [the date of the newscast] under circumstances that were clearly not suggestive. The appellant does not contend that the array itself was suggestive, but only that the same photograph was used in the array

as was broadcast on the evening news. We do not believe that such a fact made the identification procedure used here conclusive of irreparable misidentification because the pharmacist made his first positive identification from that same picture under circumstances where no suggestive measures took place.

*Id.*

{¶ 38} Although not discussed in the foregoing analysis, the facts in *Griffin* indicate that the police showed the pharmacist a second photospread using a different picture at a later date. We also note that unlike this case, *Griffin* does not involve two suspects, as the newscast at issue here not only showed a photograph of McComb, but also one of Johnson, who the witnesses had previously identified as a suspect. Accordingly, it is arguable that Martin's first positive identification of McComb from the newscast was more suggestive than the identification in *Griffin* since McComb's photograph was shown with that of Johnson's.

{¶ 39} Nevertheless, after a thorough review of the record, we are not convinced that this amounts to the kind of impermissible suggestiveness affecting the admissibility of Martin and Jones's pretrial identification of McComb, as there is nothing in the record indicating any misconduct by Detective Ritchey. "The rationale for excluding a tainted pretrial identification is to protect the defendant from misconduct by the state." *State v. Brown*, 38 Ohio St. 3d 305, 310, 528 N.E.2d 523 (1988). When there is no state action, the alleged suggestiveness of the identification goes to weight and reliability of the testimony rather than admissibility. *Id.* Accordingly, "[i]f the police have not manipulated the media in any way, exposure to media reports is not sufficient ground to

suppress the identification." *State v. Ware*, 10th Dist. Franklin No. 04AP-43, 2004-Ohio-6984, ¶ 52, citing *State v. Ward*, 10th Dist. Franklin No. 00AP-241, 2001 WL 138122, *4 (Feb. 22, 2001). (Other citations omitted.)

{¶ 40} In this case, the record of the suppression hearing indicates that in creating the photospread, Detective Ritchey used the only photograph of McComb that was available to her on the program used to make photospreads, JusticeWeb, and that the JusticeWeb photograph of McComb happened to be the same photograph used on the newscast viewed by Martin. The record does not indicate that Ritchey purposefully manipulated the photospread to match the photograph from the newscast, nor did she have any control over what photograph was displayed on the newscast.

{¶ 41} Regardless, even if we were to assume that the identification procedure in this case was unduly suggestive as a result of the matching photographs, the record does not indicate that the identification by Martin and Jones was unreliable under the totality of the circumstances. As noted above, Martin and Jones had the opportunity to view McComb in person during the robbery itself and two days later when McComb and Johnson directly approached them at Buffalo Wild Wings. Furthermore, Martin identified McComb immediately after seeing the newscast, which was just seven days after seeing McComb and Johnson at Buffalo Wild Wings. The record also indicates that both Martin and Jones expressed absolute certainty that McComb was the suspect who had fired the shots at Martin. Accordingly, the totality of the circumstances does not suggest that the identification by Martin and Jones was unreliable, and McComb does not make an argument to the contrary.

{¶ 42} For the foregoing reasons, we do not find that the trial court abused its

discretion in refusing to suppress the pretrial identification of McComb by Martin and Jones.

{¶ 43} McComb's First Assignment of Error is overruled.

## Second Assignment of Error

{¶ 44} McComb's Second Assignment of Error is as follows:

THE TRIAL COURT ERRED BY OVERRULING MCCOMB'S MOTION FOR SEPARATE TRIALS.

{¶ 45} Under his Second Assignment of Error, McComb contends the trial court should have granted his motion requesting that the charges stemming from the events of April 7, 2015 be tried separately from the charges stemming from the events of April 16, 2015. McComb claims that the failure to have separate trials on these charges prejudiced his defense to the April 7th charges. His defense was that he was misidentified as the suspect who fired shots at Martin, as he claimed he was elsewhere during the April 7th altercation. McComb feared that if the April 7th and April 16th charges were tried together, there was a substantial risk that the jury would disregard his defense to the April 7th charges since he otherwise admitted to being with Johnson during the events of April 16, 2015.

{¶ 46} Crim.R. 8(A) governs the joinder of offenses and provides as follows:

Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character, or are based on the same act or transaction, or are based on two

or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct.

**{¶ 47}** "The law favors joinder to prevent successive trials, to minimize the possibility of incongruous results in successive trials before different juries, to conserve judicial resources, and to diminish the inconvenience to witnesses." *State v. Broadnax*, 2d Dist. Montgomery No. 21844, 2007-Ohio-6584, ¶ 33, citing *State v. Schaim*, 65 Ohio St.3d 51, 58, 600 N.E.2d 661 (1992) and *State v. Torres*, 66 Ohio St.2d 340, 343, 421 N.E.2d 1288 (1981). *Accord State v. Goodner*, 195 Ohio App.3d 636, 2011-Ohio-5018, 961 N.E.2d 254, ¶ 39 (2d Dist.).

**{¶ 48}** "Even if offenses are properly joined pursuant to Crim.R. 8(A), a defendant may move to sever the charges pursuant to Crim.R. 14." *Broadnax* at ¶ 37. We note that McComb's motion for separate trials does not specifically challenge the appropriateness of joinder under Crim.R. 8(A), but rather argues that separate trials are appropriate under Crim.R. 14, which requires the trial court to order separate trials "[i]f it appears that a defendant * * * is prejudiced by a joinder of offenses[.]"

**{¶ 49}** "Joinder may be prejudicial when the offenses are unrelated and the evidence as to each is very weak, * * * but it is otherwise when the evidence is direct and uncomplicated and can reasonably be separated as to each offense[.]" (Citations omitted.) *Torres* at 343-344. "The mere possibility that the defendant might have a better choice of trial tactics if the counts are separated, or the mere possibility that he might desire to testify on one count and not on the other, is insubstantial and speculative; it is not sufficient to show prejudice." (Citation omitted.) *Id.* at 344.

**{¶ 50}** "One of the ways in which the State can negate a defendant's claim of

prejudice is by showing that the evidence pertaining to each crime joined at trial is simple and direct, such that the trier of fact could segregate the proof on the multiple charges." (Citations omitted.) *Broadnax,* 2d Dist. Montgomery No. 21844, 2007-Ohio-6584 at ¶ 38. *Accord State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 30.

**{¶ 51}** If the trial court refuses to sever offenses, the "defendant must demonstrate that the court abused its discretion in refusing to separate the charges for trial." *Broadnax* at ¶ 37, citing *State v. Lott*, 51 Ohio St.3d 160, 555 N.E.2d 293 (1990). (Other citations omitted.) However, if a motion for prejudicial misjoinder is not renewed at the close of the state's case or at the conclusion of the evidence, a defendant forfeits his ability to raise the issue on appeal and we review the matter only for plain error. *State v. Stargell*, 2016-Ohio-5653, 70 N.E.3d 1126, ¶ 12 (2d Dist.). *Accord State v. Bates*, 2d Dist. Clark No. 2005 CA 83, 2006-Ohio-4146, ¶ 33; *State v. Rutledge*, 2d Dist. Montgomery No. 18462, 2001 WL 587555, *6 (June 1, 2001); *State v. Day*, 2d Dist. Clark No. 2141, 1986 WL 13241, *2 (Nov. 24, 1986) ("[a] motion for severance due to prejudicial joinder of offenses must be renewed at the close of the state's case or at the conclusion of all the evidence, to avoid waiving the issue"); *State v. Montgomery*, 2d Dist. Montgomery No. 22193, 2009-Ohio-1415, ¶ 16-18 (reviewing for plain error where the defendant did not renew his motion for severance). " 'To prevail under the plain-error standard, a defendant must show that an error occurred, that it was obvious, and that it affected his substantial rights.' " *Stargell* at ¶ 12, quoting *State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93, ¶ 62.

**{¶ 52}** In this case, the record reveals that McComb failed to renew his claim of prejudicial joinder of the April 7th and April 16th charges at the close of the state's case

or at the close of evidence. Therefore, McComb has waived all but plain error with respect to that claim.

{¶ 53} Upon review, we find no obvious error in the trial court's failure to sever the April 7, 2015 charges from the April 16, 2015 charges for trial. As previously noted, McComb's motion alleged prejudice on grounds that there was a substantial risk that the jury would disregard his misidentification defense to the April 7th charges since he admitted to being with Johnson during the events of April 16, 2015. The prejudice McComb complains of does not arise from the jury's confusion of the facts concerning the multiple charges he faced; rather, McComb's argument is based on a tactical concern about how the jury would judge his credibility and how the evidence would unfold for him at trial. This is insufficient to show prejudice. *See Broadnax,* 2d Dist. Montgomery No. 21844, 2007-Ohio-6584 at ¶ 40 (denying defendant's motion to sever his charges for trial where "the prejudice [d]efendant suggests is not in the jury's confusion of the facts concerning the multiple alleged offenses, but in disbelieving his alibi defenses if his testimony concerning other offenses caused the jury to reject his credibility[,]" and noting "[t]hat is merely a tactical concern, not one relating to the fairness of [d]efendant's trial").

{¶ 54} Moreover, the evidence pertaining to the joined offenses in this case is simple and direct, and the facts and witnesses surrounding the April 7th and April 16th events are separate, distinct, and uncomplicated, making it improbable that the jury would confuse the evidence. *See Torres,* 66 Ohio St.2d at 343-344, 421 N.E.2d 1288; *Broadnax* at ¶ 38. Accordingly, we find no error, let alone plain error in the trial court's decision to deny McComb's motion for separate trials.

{¶ 55} McComb's Second Assignment of Error is overruled.

**Third and Fourth Assignments of Error**

{¶ 56} For purposes of clarity and convenience we will address McComb's Third and Fourth Assignments of Error together. They are as follows:

III.   MCCOMB'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

IV.   THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT MCCOMB'S CONVICTION FOR COUNT IX, GRAND THEFT OF A FIREARM.

{¶ 57} Under his Third and Fourth Assignments of Error, McComb contends that his conviction on each of the charges is against the manifest weight of the evidence and that there was insufficient evidence presented at trial to support his conviction for grand theft of a firearm.

{¶ 58} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law."  *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).  "When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt."  (Citations omitted.)  *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997).  "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact."

(Citations omitted.)   *Id.*

{¶ 59} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive."   (Citation omitted.)   *Wilson* at ¶ 12.   When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."   *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).   "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence."   *State v. Adams*, 2d Dist. Greene Nos. 2013 CA 61, 2013 CA 62, 2014-Ohio-3432, ¶ 24, citing *Wilson* at ¶ 14.

{¶ 60} " 'Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency.' "   *State v. Flores-Lopez*, 2d Dist. Montgomery No. 26964, 2016-Ohio-7687, ¶ 26, quoting *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11.   (Other citations omitted.)   "Consequently, 'a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency.' "   *Id.*, quoting *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

{¶ 61} Because the trier of fact sees and hears the witnesses at trial, we must defer

to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). Accordingly, "[t]he credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve." *State v. Hammad*, 2d Dist. Montgomery No. 26057, 2014-Ohio-3638, ¶ 13, citing *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). "This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the factfinder lost its way." (Citation omitted.) *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510, *4 (Oct. 24, 1997).

{¶ 62} As previously noted, in this case, McComb was convicted of three counts of aggravated robbery with three firearm specifications, one count of felonious assault with a firearm specification, one count of grand theft of a firearm with a firearm specification, and two counts of having a weapon while under disability. For many of these offenses, the State proceeded at trial on the theory of complicity.

{¶ 63} The statute governing complicity provides that: "No person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense." R.C. 2923.03(A)(2). Accordingly, "[i]f a person acting with the kind of culpability required for the commission of an offense aids or abets another in committing the offense, that person is guilty of complicity in the commission of the offense, and shall be prosecuted and punished as if he were a principal offender." *State v. Wade*, 2d Dist. Clark No. 06-CA-108, 2007-Ohio-6611, ¶ 20, citing R.C. 2923.03(A)(2) and (F).

{¶ 64} A person aids and abets the commission of a crime when he supports, assists, encourages, cooperates, advises or incites the principal offender in the

commission of the offense.  *Id.*, citing *State v. Johnson*, 93 Ohio St.3d 240, 245, 754 N.E.2d 796 (2001).  "Ohio courts have recognized that '[e]vidence of aiding and abetting another in the commission of crime may be demonstrated by both direct and circumstantial evidence.' "  *Id.*, quoting *State v. Cartellone*, 3 Ohio App.3d 145, 150, 444 N.E.2d 68 (8th Dist.1981).  " 'Thus, "participation in criminal intent may be inferred from presence, companionship, and conduct before and after the offense is committed." ' "  *Id.*, quoting *Cartellone*, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971).

*Aggravated Robbery*

{¶ 65} McComb was convicted of three counts of aggravated robbery in violation of R.C. 2911.01(A)(1), which provides as follows:

(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]

{¶ 66} A "theft offense" includes, but is not limited to, a violation of R.C. 2913.02, which provides that a person commits theft if he or she knowingly obtains or exerts control over property without the consent of the owner with the purpose to deprive the owner of the property.  R.C. 2913.02(A)(1), R.C. 2913.01(K)(1).  "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature.  A person has knowledge

of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B).

**{¶ 67}** "A 'deadly weapon' is defined as 'any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon.' " *State v. Lauderdale*, 2d Dist. Montgomery Nos. 26454, 26456, 2016-Ohio-3357, ¶ 25, citing R.C. 2923.11(A). " 'For purposes of establishing the crime of aggravated robbery, a jury is entitled to draw all reasonable inferences from the evidence presented that the robbery was committed with the use of a gun, and it is not necessary that the prosecution prove that the gun was capable of firing a projectile.' " *Id.*, quoting *State v. Vondenberg*, 61 Ohio St.2d 285, 401 N.E.2d 437 (1980), syllabus.

**{¶ 68}** For the two charges of aggravated robbery that stemmed from the events of April 16, 2015, the State presented testimonial evidence from Robbie Deaton who testified that during an attempted sale of home theater equipment to McComb and Johnson, McComb approached him while he was sitting inside his vehicle, pointed a gun at his face, and ordered him to "[t]urn the car off and give me the key or I'm going to kill you." Trial Trans. Vol. II (Sept. 22, 2015), p. 334. Deaton testified that after he gave McComb the key, McComb opened the driver's side door where he was sitting, pressed the gun against his chest, searched his pockets for money, and took his cellphone.

**{¶ 69}** After the key and cellphone were taken, Deaton testified that McComb went to assist Johnson in taking $300 from his stepfather, Joshua Howard, as Deaton observed Johnson and McComb struggle with Howard and later learned that Howard no longer had $300 in cash they had made from a prior sale earlier that day. Deaton further testified that he observed McComb hold onto Howard by his shirt collar with the firearm in his other

hand while Johnson proceeded to load the home theater equipment into their white SUV.

{¶ 70} The investigating officers testified that McComb had three cell phones and $356 in cash on his person when he was apprehended on April 16, 2015. The State presented photographic evidence of one of the cellphones that was found on McComb, and at trial, Deaton confirmed that the cellphone depicted in the photograph belonged to him.

{¶ 71} A resident who lived near the scene of the robbery testified that on the day in question a man came to her house and asked her to call 9-1-1 because he had been robbed at gunpoint. The resident testified that she called 9-1-1, and the call was subsequently played for the jury. This evidence aligned with Deaton's testimony that Howard sought help from a nearby resident, who called 9-1-1 for them.

{¶ 72} The officers who responded to the 9-1-1 call testified that they found two shell casings and a bullet at the scene, which supported Deaton's testimony that Johnson had fired a warning shot at Howard during their struggle, as well as at their vehicle as McComb and Johnson drove away. Detective Douglas Baker testified that the shell casings were rare in that they were made from aluminum as opposed to brass or chrome. Baker further testified that during his investigation he discovered a similar aluminum shell casing at the residence of one of Johnson's relatives, Christina Bright, who advised that Johnson stayed at her residence from time to time. A forensic expert opined to a reasonable degree of scientific certainty that the aluminum shell casings found at Dayview Circle and at Bright's residence came from the same firearm.

{¶ 73} In addition, the State provided video footage from Precision Auto Tune, the body shop where Deaton and Howard first encountered McComb and Johnson. The

record indicates that the footage aligned with Deaton's testimony as to how he came into contact with McComb and Johnson. McComb himself testified that he encountered Deaton and Howard at Precision Auto Tune and admitted that he was involved in purchasing home theater equipment from them on April 16, 2015.

{¶ 74} McComb, however, denied having a gun or robbing Deaton and Howard. Instead, McComb claimed that he and Johnson paid Deaton and Howard for the home theater equipment by giving them a gram of crack cocaine, with an agreement that Deaton and Howard would return to Dayton the next day to collect an additional $200 in cash for the purchase. According to McComb, Howard angrily called him on his cellphone 20 minutes after the sale claiming the crack cocaine he provided to them was not a full gram. The record indicates that no drugs were ever discovered on Deaton or Howard.

{¶ 75} As for how he had Deaton's cellphone, McComb testified that Deaton must have dropped it while he was loading the home theater equipment into Johnson's vehicle. McComb further claimed that he thought the cellphone was Johnson's and that he grabbed it as he jumped out of Johnson's vehicle during the high-speed pursuit with police.

{¶ 76} Based on the evidence presented, we do not find that McComb's conviction for the two counts of aggravated robbery arising on April 16, 2015, was against the manifest weight of the evidence. As to the first count, the weight of the evidence establishes that McComb knowingly deprived Deaton of his cellphone without Deaton's permission while brandishing a firearm. As to the second count, the weight of the evidence establishes that McComb knowingly aided and abetted Johnson in depriving Howard of $300 and the home theater equipment without his permission while

brandishing a firearm. The jury did not lose its way or create a manifest miscarriage of justice in discrediting McComb's version of events, as the weight of the evidence supports the aggravated robbery convictions.

{¶ 77} For the charge of aggravated robbery that stemmed from the events of April 7, 2015, the State presented testimonial evidence from Tyree Martin, who testified that while he was on the front porch of a residence at 927 West Riverview Terrace to pick up his friend Joshua Jones, Johnson and McComb approached him and demanded to know what he was doing there. Martin testified that McComb was holding a gun inside his sweatshirt throughout the encounter. Jones, Martin's friend and roommate, likewise testified that McComb was holding a gun during the confrontation on the front porch and that no other person had a gun at that time. Jones also testified that when he went on the porch, McComb took his I.D., money, and cellphone.

{¶ 78} Martin testified that after Johnson realized he called 9-1-1 on his cellphone, Johnson told McComb to shoot Martin in the face. Martin also testified that Johnson and McComb chased him to his car and that he and Johnson were on opposite sides of his car struggling to get control over a gun that Martin had attempted to retrieve from the console of his vehicle. Martin claimed he was able to get control over the gun from Johnson and upon doing so, he turned and ran to the back of his vehicle while McComb fired four to five shots at him from 12 to 15 feet away. Martin testified that he tried to fire back, but that he could not get the gun to fire in the midst of McComb shooting at him, so he dropped the gun, ducked down, and ran away.

{¶ 79} Jones also testified that he saw Johnson and McComb chase Martin to his vehicle after hearing the 9-1-1 operator on Martin's cellphone. Although there was a pole

blocking his view from the porch, Jones testified that he heard four to five shots as Johnson and McComb were chasing Martin and thereafter saw Johnson drive away in Martin's vehicle. During redirect examination, Jones also agreed that Johnson had picked up the gun that Martin had dropped prior to driving away in Martin's vehicle.

{¶ 80} Both Martin and Jones testified that two days after the shooting, on April 9, 2015, Johnson and McComb approached them while they were eating at a Buffalo Wild Wings restaurant in Dayton. They also testified that McComb had a gun on him during that encounter and that they recognized McComb as the person who fired shots at Martin two days earlier. Martin further testified that McComb threatened him at the restaurant and told him that he could have his vehicle back for $500 or his gun and vehicle back for $700. Following that encounter, both Martin and Jones identified McComb as the shooter in a photospread performed on April 20, 2015, as well as at trial.

{¶ 81} The investigating officers testified that two shell casings were found in the street where Martin claimed the shots were fired. The investigating officers further testified that the keys to Martin's vehicle were discovered in the white SUV that Johnson and McComb were driving during the April 16, 2015 robbery of Deaton and Howard. Moreover, Martin testified that his vehicle was found by officers a week after the shooting at a residence Martin knew belonged to Johnson's mother.

{¶ 82} McComb testified that he was never at 927 West Riverview Terrace on April 7, 2015, as he claimed he had spent the entire night in question at the residence of his girlfriend, Shawanna Kelly. Kelly also testified on McComb's behalf, confirming his alibi. McComb did, however, admit to being present at Buffalo Wild Wings with Johnson on April 9, 2015, but denied having a gun or speaking to Martin.

{¶ 83} Based on the evidence presented, we do not find that McComb's conviction for the single count of aggravated robbery on April 7, 2015, was against the manifest weight of the evidence. The weight of the evidence establishes that McComb knowingly aided and abetted Johnson in depriving Martin of his firearm without his permission by shooting at him. Specifically, there was evidence that Johnson attempted to deprive Martin of the gun as they struggled over it in Martin's car, and that after Johnson initially failed to obtain the gun, McComb fired shots at Martin, which contributed to Martin dropping the gun and permitted Johnson to subsequently pick up the gun and drive away with it. In addition, there was evidence that McComb later offered to sell the stolen gun back to Martin, which the jury could have reasonably determined to be further evidence of McComb's shared criminal intent with regards to the robbery.

{¶ 84} We also note that there was evidence that McComb stole Jones's I.D., money, and cell phone while displaying his firearm on the front porch of 927 West Riverview Terrace. The jury also could have reasonably relied on that evidence in convicting McComb.

{¶ 85} While McComb testified that he was not present during the April 7, 2015 altercation and claims he was misidentified as the shooter, the jury was nevertheless free to discredit his testimony and the testimony of his alibi witness. Although there are some inconsistencies in the testimony offered by the State's witnesses with regards to this count of aggravated robbery, we nevertheless find that the jury did not lose its way or create a manifest miscarriage of justice in convicting McComb, as the weight of the evidence supports the conviction.

*Grand Theft of a Firearm*

{¶ 86} McComb was also convicted for one count of grand theft of a firearm in violation of R.C. 2913.02(A)(1) in relation to the April 7, 2015 incident with Martin. R.C. 2913.02(A)(1) provides that: "No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services ** * [w]ithout the consent of the owner or person authorized to give consent."

{¶ 87} For this charge, the Stated proceeded under a theory of complicity. As previously noted, the weight of the evidence establishes that McComb knowingly aided and abetted Johnson in depriving Martin of his firearm without his permission when McComb fired multiple shots at Martin, which contributed to Martin dropping the firearm and permitted Johnson to subsequently pick up the firearm and drive away with it. Furthermore, there was evidence presented that McComb later demanded money for the return of Martin's firearm, which the jury could have reasonably determined to be further evidence of McComb's shared criminal intent with regards to the theft. Accordingly, McComb's conviction for grand theft of a firearm is not against the manifest weight of the evidence.

{¶ 88} Because a determination that a conviction is supported by the weight of the evidence is dispositive of the issue of sufficiency, we necessarily find that McComb's conviction for grand theft of a firearm was also supported by sufficient evidence. *See Flores-Lopez*, 2d Dist. Montgomery No. 26964, 2016-Ohio-7687 at ¶ 26. Accordingly, McComb's claim under his Fourth Assignment of Error as to the sufficiency of the evidence for this charge lacks merit.

*Felonious Assault*

{¶ 89} McComb was further convicted of one count of felonious assault in violation

of R.C. 2903.11(A)(2), which provides: "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance."

{¶ 90} As previously noted, "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). In addition, "[a] 'deadly weapon' is defined as 'any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon.' " *Lauderdale*, 2d Dist. Montgomery Nos. 26454, 26456, 2016-Ohio-3357 at ¶ 25, citing R.C. 2923.11(A).

{¶ 91} The State presented testimony from Martin and Jones indicating that McComb had a gun and that he fired four to five shots at Martin while at close range after Johnson ordered Martin to shoot him in the face. This testimony was supported by shell casings found in the street where Martin claimed McComb fired the shots. Accordingly, we find that McComb's conviction for felonious assault was not against the weight of the evidence, as the evidence indicates that McComb knowingly attempted to cause physical harm to Martin through use of a deadly weapon.

*Firearm Specifications*

{¶ 92} Each of the counts for aggravated robbery, grand theft of a firearm, and felonious assault carried an attendant three-year firearm specification for which McComb was also convicted. Pursuant to R.C. 2941.145(A), a mandatory three-year prison term for a firearm specification is permitted where the indictment specifies and the jury finds

"that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense." R.C. 2941.145(A).

{¶ 93} " 'Firearm' means any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. 'Firearm' includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable." R.C. 2923.11(B)(1). "When determining whether a firearm is capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant, the trier of fact may rely upon circumstantial evidence, including, but not limited to, the representations and actions of the individual exercising control over the firearm." R.C. 2923.11(B)(2).

{¶ 94} In this case, the weight of the evidence establishes that McComb had a firearm on his person while committing the offenses at issue and displayed/brandished the firearm and/or used the firearm to facilitate the offenses. For the April 7, 2015 robbery, the evidence establishes that McComb actually shot a firearm multiple times at Martin, indicating its operability. For the April 16, 2015 robbery, the evidence establishes that McComb threatened to kill Deaton while pointing a firearm at his face and then pressed the firearm into his chest while searching him. The evidence also establishes that McComb used the firearm to facilitate robbing Howard of $300 and the home theater equipment. McComb's statement to Deaton combined with his actions while exercising control over the firearm indicate the firearm was readily operable. Accordingly, we find McComb's convictions for the firearm specifications were not against the manifest weight

of the evidence.

*Having a Weapon While Under Disability*

**{¶ 95}** Lastly, McComb was convicted of two counts of having a weapon while under disability in violation of R.C. 2923.13(A)(2), which provides that: "[N]o person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * [t]he person is under indictment for or has been convicted of any felony offense of violence or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence."

**{¶ 96}** Prior to trial, the parties stipulated that McComb had been adjudicated a delinquent child for the commission of an offense that would have been a felony if committed by an adult, i.e., aggravated robbery. Based on the evidence presented at trial, we do not find the trial court, as trier of fact on these two counts, created a manifest miscarriage of justice in finding that McComb knowingly had a firearm during both the April 7, 2015 and April 16, 2015 robberies. As noted earlier, that finding is supported by the weight of the evidence.

**{¶ 97}** For the foregoing reasons, we find that each of McComb's convictions were not against the manifest weight of the evidence and were necessarily supported by sufficient evidence. Accordingly, McComb's Third and Fourth Assignments of Error are overruled.

**Conclusion**

**{¶ 98}** Having sustained McComb's first supplemental assignment of error, the judgment of the trial court sentencing McComb to mandatory prison terms for his

aggravated robbery and felonious assault offenses is reversed and the matter is remanded for resentencing only as to those offenses. Because we have overruled all the remaining assignments of error raised herein, the judgment of the trial court is affirmed in all other respects.

. . . . . . . . . . . .

HALL, P.J. and FROELICH, J., concur.

Copies mailed to:

Mathias H. Heck, Jr.
Andrew T. French
Robert Alan Brenner
Hon. James A. Brogan (retired from the Ohio Second District Court of Appeals, sitting by assignment), c/o Hon. Mary Katherine Huffman, Administrative Judge, Montgomery County Common Pleas Court