[Cite as *State v. Reed*, 2018-Ohio-4047.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27824 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-1669/2 |
| | : | |
| THURMAN Z. REED | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 5th day of October, 2018.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
       Attorney for Plaintiff-Appellee

ANDREW C. SCHLUETER, Atty. Reg. No. 0086701, P.O. Box 96, Xenia, Ohio 45385
       Attorney for Defendant-Appellant

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Defendant-appellant, Thurman Z. Reed, appeals from his convictions in the Montgomery County Court of Common Pleas; the trial court found him guilty of felonious assault, improper handling of a firearm in a motor vehicle, discharge of a firearm on or near a prohibited premises, and two counts of having a weapon under disability.  In support of his appeal, Reed contends that his convictions for all the aforementioned offenses was against the manifest weight of the evidence.   Reed also contends that his charges for having a weapon under disability should have been dismissed pursuant to the Supreme Court of Ohio's decision in *State v. Hand*, 149 Ohio St.3d 94, 2016-Ohio-5504, 73 N.E.3d 448, because the predicate offenses on which those charges were based were juvenile adjudications.   For the reasons outlined below, the judgment of the trial court will be affirmed.

**Facts and Course of Proceedings**

{¶ 2} On July 5, 2016, the Montgomery County Grand Jury returned an indictment charging Reed with one count of felonious assault in violation of R.C. 2903.11(A)(2). This charge included three firearm specifications for possessing a firearm, discharging a firearm in a motor vehicle, and discharging a firearm at a peace officer.   Reed was also charged with one count of improperly handling a firearm in a motor vehicle in violation of R.C. 2923.16(A), one count of discharging a firearm on or near a prohibited premises in violation of R.C. 2923.162(A)(3), which also included a firearm specification, and two counts of having a weapon under disability, in violation of R.C. 2923.13(A)(2) and R.C. 2923.13(A)(3) respectively.   The charges arose from allegations that Reed fired multiple

gunshots at a police cruiser during a high-speed chase.

{¶ 3} Following his indictment, Reed pled not guilty to the charges and waived his right to a jury trial. Thereafter, on October 23, 2017, Reed's case was tried to the bench. At trial, the State called several witnesses, including Officers David Eck and Jeremy Stewart of the Dayton Police Department. Officers Eck and Stewart testified that on the night of May 29, 2016, they were dispatched to the Summit Square Apartment Complex ("Summit Square") in Dayton, Montgomery County, Ohio, on a disturbance call. Officer Stewart testified that it was reported several individuals were yelling and arguing in the parking lot of Summit Square and that a gun had been observed.

{¶ 4} Officer Eck was the first to arrive at Summit Square with Officer Stewart just one car behind. Eck testified that as he pulled into Summit Square, he activated his spotlight to illuminate the parking lot and immediately observed a black SUV pulling out from a parking space. Eck testified that the SUV, which had at least three individuals inside, almost struck the front of his cruiser as it crossed in front of him to leave the area. After nearly being struck by the SUV, Eck testified that he told Officer Stewart over the radio to follow the SUV and conduct a traffic stop. Per Eck's request, Stewart turned around and attempted to conduct a traffic stop of the SUV.

{¶ 5} Officer Stewart testified that, when the SUV exited Summit Square and turned onto Hoover Avenue, he observed the SUV fail to signal and yield for oncoming traffic before turning. After observing that traffic violation, Stewart activated his overhead lights and sirens in an effort to conduct a traffic stop. While following the SUV on Hoover Avenue, Stewart testified that he saw a "muzzle flash" pointed back at his cruiser and heard three gunshots. Trans. Vol. I (Oct. 23, 2017), p. 135. Stewart also testified that

he heard bullets passing by his window.

**{¶ 6}** An evidence technician from the Dayton Police Department testified that he collected four .9-millimeter shell casings on Hoover Avenue where the shots were alleged to have been fired. The shell casings were admitted as evidence as well as photographs of Officer Stewart's cruiser showing bullet-hole damage. *See* State's Exhibit No. 21.

**{¶ 7}** Immediately after the shots were fired, Stewart testified that he got on the radio and reported that the driver of the SUV had fired shots at his cruiser. Stewart's written report of the incident also indicated that the driver was the shooter. Relying on Stewart's observations, Officer Eck, who did not see the shots for himself, also included in his written report that the driver of the SUV leaned out of the driver's window and fired a pistol at Stewart's cruiser.

**{¶ 8}** Although his radio call and report indicated that the driver of the SUV was the shooter, Officer Stewart clarified at trial that he could not say for sure whether it was actually the driver who fired the shots. Specifically, Stewart testified that he was unsure if the shots came from the rear or front driver's-side window of the SUV. However, Stewart testified that he was otherwise certain the shots came from the driver's side of the SUV.

**{¶ 9}** Video footage taken from Officer Stewart's cruiser camera was admitted into evidence; the footage showed an individual leaning out the driver's side of the SUV and muzzle flashes coming from the driver's side of the SUV. It is unclear from the video whether the individual was leaning out the front or rear driver's-side window.

**{¶ 10}** Officer Stewart testified that, after the shots were fired, he continued to pursue the SUV, along with several other police crews that responded to his shots-fired

call. Stewart testified that the pursuit lasted five to ten minutes at speeds exceeding 90 mph. At the end of the pursuit, Stewart testified that the SUV went over the curb on Gramont Avenue and stopped in a grassy area. At that time, Stewart observed two occupants flee from the passenger side of the SUV on foot. Due to the angle of Stewart's cruiser camera and the position of his cruiser, the view of the occupants fleeing from the SUV in the video evidence was limited. The video evidence only showed one of the occupants fleeing from the passenger side of the SUV. However, Stewart can be heard in the video saying: "Baling in the alley. Bailing in the alley. Baling in the alley. Two males. Two males." State's Exhibit No. 2.

{¶ 11} Officer Stewart testified that he attempted to pursue the two occupants on foot, but lost sight of them as they jumped over some fences. However, Stewart testified that he later assisted with the apprehension of one of the occupants, Devon Smith, who was taken into custody several houses away from where the SUV had stopped. Stewart testified that when he made contact with Smith, Smith was very sweaty, not wearing a shirt or shoes, and out of breath as if he had been running.

{¶ 12} Officer Stewart testified that he later learned a third occupant, identified as Maurice Myles, was discovered inside the SUV. Officer Devin Portis, also with the Dayton Police Department, testified that he arrived on scene after the pursuit had ended and that, when he arrived, another officer was commanding Myles to exit the SUV and show his hands. Portis testified that Myles was in the rear passenger's seat of the SUV. After Myles exited the SUV, Portis testified that he transported Myles to the Dayton Police Department to be interviewed. Once there, Portis testified that an empty gun holster fell out of Myles's pants as he and Myles were riding in the elevator. Portis also testified that

Myles continually claimed he was not the shooter.

**{¶ 13}** Devon Smith, the occupant apprehended by Stewart, testified that Myles was his friend and that on the day in question, Myles and Reed, the appellant herein, stopped by his house in the SUV and drove him to Summit Square. Smith testified that he sat in the back seat while Myles drove and that Reed sat in the front passenger seat. Smith testified that he had never met Reed before that day, but learned that Reed had just been released from jail and that Summit Square was Reed's neighborhood. Smith testified that he, Myles, and Reed were at Summit Square all day "chilling" with a bunch of people outside. Trans. Vol. I (Oct. 23, 2017), p. 183.

**{¶ 14}** Smith testified that both Myles and Reed were carrying firearms. At trial, Smith described Reed's gun as having an "extended clip" and Myles's gun as being a "little rocket pocket * * * [l]ittle, little gun." *Id.* at 187. Smith testified that, before he arrived at Summit Square, Reed and Myles were there earlier in the day and almost got into a fight with an unknown individual. Smith testified that the unknown individual's girlfriend became upset later that evening and that someone called the police claiming to have seen a gun.

**{¶ 15}** After learning the police had been called, Smith testified that he, Myles, Reed, and a fourth individual he did not know got inside the SUV, which was parked in Summit Square's parking lot. Smith testified that he was located in the front passenger's seat, Myles was in the driver's seat, Reed was in the rear driver's-side seat behind Myles, and the fourth individual was in the rear passenger's seat behind Smith. As they saw the police cruisers approaching, Smith testified that Myles pulled out of the parking space to leave Summit Square. Smith then testified that he saw a police cruiser turn around

and activate its lights.    Shortly after seeing the police cruiser, Smith testified that "[Reed] just rolled down the window and got to shooting."    *Id.* at 188.

{¶ 16} Although Smith testified that he did not actually see Reed shooting the gun, Smith did testify that he turned around right after the shots were fired and saw that Reed had a gun in his hand with the window down.    According to Smith, Myles became upset when Reed fired the shots, and said: "Bro, why you do that, * * * that's dumb, bro.    You got to take that charge."    *Id.*    Smith claimed that Myles's window was up when the shots were fired and that Myles did not have a gun in his hand.    Smith, however, testified that Myles eventually rolled down his window during the chase to throw away his gun.

{¶ 17} Continuing, Smith testified that when the SUV stopped at Gramont Avenue, he got out of the SUV and fled from the front passenger seat.    Smith testified that he took off his shirt while fleeing and that his sandals also fell off.    Smith admitted that he initially lied to police when he was apprehended, as he told police he was out jogging and knew nothing about the shooting.    Although Smith eventually admitted that he was a passenger inside the SUV and that Reed was the shooter, Smith's prior account of the incident omitted the presence of the fourth individual in the SUV.    Smith testified that he did not speak about the fourth individual earlier because the individual did not do anything during the shooting incident.

{¶ 18} Smith also admitted to providing an inaccurate account of the incident during a later interview with detectives and the prosecutor.    During that interview, Smith told the authorities that he had been sitting behind Myles in the SUV and that Reed reached across him and fired several shots out the window.    Smith claimed he was high on marijuana during that interview, and that he did not even know where he was when he

made that inaccurate statement. According to Smith, the true account of what happened was what he testified to at trial, specifically, that Reed was located in the rear driver's-side seat behind Myles and that Reed fired shots out of the rear driver's-side window.

{¶ 19} The investigating detective, Thomas Cope, confirmed that Smith initially lied to authorities about what happened, but testified that Smith eventually admitted to being in the SUV with Myles and Reed, and to Reed's firing shots at Stewart's police cruiser. Cope also testified that both Smith and Myles identified Reed as the shooter in a photo spread. In addition, Cope testified that Myles's and Smith's accounts of what happened were almost identical, and that Myles and Smith were separated at all times and had no chance to coordinate in their stories.

{¶ 20} Cope further testified that he picked up Reed in Dakota County, Minnesota, and subsequently interviewed him. According to Cope, Reed indicated that he owned a gold cell phone that was discovered by police under a car mat located beneath the driver's seat of the SUV. Cope testified that Reed told him he had given the cell phone to Myles to use on the day of the shooting. Cope thereafter testified that Myles admitted to being the driver of the SUV and had since pled guilty to failure to comply with the order or signal of a police officer.

{¶ 21} Another officer with the Dayton Police Department, Officer Melissa Boyes, testified that she searched the SUV and discovered a magazine for a handgun in the center console of the SUV. An evidence technician testified that the magazine contained nine live .45-caliber bullets. The technician further testified that only one bullet was missing from the magazine.

{¶ 22} During trial, the parties made several stipulations, including that Reed's right

index finger print was recovered from the exterior of the front passenger window of the SUV. The parties also stipulated that Reed had two prior juvenile adjudications in Montgomery County, one for possessing drugs and carrying a concealed weapon, and the other for burglary. In lieu of testimony, the parties also stipulated to the results of DNA tests performed on the shell casings, magazine, and other items found in the SUV. The DNA testing indicated that insufficient results were obtained from the shell casings and that no determinations could be made with regard to whether Reed's DNA was on the magazine. However, the report indicated that Smith was excluded as a possible contributor of DNA on the magazine.

{¶ 23} After the State rested its case, Reed moved for acquittal pursuant to Crim.R. 29, which the trial court denied. Reed then rested his case. After taking the matter under advisement, the trial court found Reed guilty as charged. Thereafter, at sentencing, the trial court merged several of the counts and specifications and ordered Reed to serve an aggregate term of eighteen years in prison.

{¶ 24} Reed now appeals from his convictions, raising two assignments of error for our review.

### First Assignment of Error

{¶ 25} Reed's First Assignment of Error is as follows:

APPELLANT'S CONVICTIONS OF FELONIOUS ASSAULT, IMPROPER HANDLING FIREARMS IN A MOTOR VEHICLE, DISCHARGE OF FIREARM ON OR NEAR PROHIBITED PREMISES, AND HAVING WEAPONS UNDER DISABILITY ARE AGAINST THE MANIFEST

WEIGHT OF THE EVIDENCE.

{¶ 26} Under his First Assignment of Error, Reed contends his convictions for felonious assault, improper handling of a firearm in a motor vehicle, discharge of a firearm on or near a prohibited premises, and having a weapon under disability were against the manifest weight of the evidence. In support of this argument, Reed claims the weight of the evidence demonstrated that he was not the individual who fired shots from the SUV. We disagree.

{¶ 27} "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12. When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013 CA 61, 2013 CA 62, 2014-Ohio-3432, ¶ 24, citing *Wilson* at ¶ 14.

{¶ 28} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL

476684, *4 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. *Id.* A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 29} According to Reed, the weight of the evidence established that the driver of the SUV was the shooter. In support of this argument, Reed points to the statements Officer Stewart made in his report and during his radio call that indicated the driver of the SUV fired multiple shots at his police cruiser. Reed further points to Officer Eck's report, which also indicated that the driver leaned out of the window and fired multiple shots at Stewart's police cruiser. According to Reed, because Myles admitted to being the driver of the SUV by virtue of pleading guilty to the charge of failure to comply, Reed could not have been the driver, and thus could not have been the shooter. Reed also claims the evidence indicated Myles was the shooter since an empty gun holster was found on his person and a live magazine was found in the center console of the SUV within Myles's reach.

{¶ 30} In making his argument, Reed discounts Officer Stewart's trial testimony. As noted above, Stewart testified that he was uncertain whether it was the driver who fired the shots at him. Rather, Stewart testified he was only certain the shots came from the driver's side of the SUV and that the shots could have come from either the front or rear driver's-side window. At trial, Stewart clarified that the statement in his report and in his radio call about the driver shooting at him may not have been accurate. Stewart, however, explained that the radio call was made during the chaos of the situation and that he was doing his best to describe what was happening at the moment. Therefore,

pursuant to Stewart's testimony, the driver of the SUV was not necessarily the shooter.

{¶ 31} Moreover, contrary to Reed's claim otherwise, the fact that Myles was found carrying an empty gun holster, and the fact that a live magazine was within Myles's reach in the center console of the SUV, did not necessarily indicate that Myles was the shooter. Smith, who was with Myles and Reed on the day in question, testified that both Myles and Reed were carrying firearms. Furthermore, the evidence indicated that four .9-millimeter bullets were fired at Officer Stewart's cruiser, and the magazine found in the center console near Myles contained nine .45-caliber bullets, with only one bullet missing from the magazine. Thus, the location of the magazine did not necessarily indicate that Myles was the shooter, given that a .45-caliber firearm was not used during the shooting.

{¶ 32} Most importantly, Smith specifically testified that he was present in the SUV and that Reed was the individual who fired shots at Stewart's cruiser. Although Reed argues that Smith was not a credible witness because Smith testified to smoking marijuana and to not being forthright with the authorities during the investigation, it was for the trial court as trier of fact to determine whether Smith's trial testimony was credible. It is not the position of this court to question the trier of fact's credibility determinations.

{¶ 33} The record indicates that Smith was subject to extensive cross-examination about the inconsistencies and contradictions between his trial testimony and his previous statements to police. The trial court, therefore, had the opportunity to see and hear Smith and to weigh his credibility in the light of the totality of the evidence. Simply because the trial court chose to believe Smith's testimony did not mean that Reed's convictions were against the manifest weight of the evidence.

{¶ 34} That said, having reviewed the record, we find the trial court could have

reasonably credited all the evidence presented by the State, including Smith's eyewitness testimony, and evaluated said evidence and all reasonable inferences to conclude that Reed was the shooter and thus guilty of felonious assault, improper handling of a firearm in a motor vehicle, discharge of a firearm on or near a prohibited premises, and having a weapon under disability.   Therefore, based on the facts and circumstances of this case, we do not find that the evidence weighed heavily against Reed's convictions or that the trial court clearly lost its way and created a manifest miscarriage of justice.

{¶ 35} Reed's First Assignment of Error is overruled.


**Second Assignment of Error**

{¶ 36} Reed's Second Assignment of Error is as follows:

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION

TO DISMISS COUNTS 4 AND 5 OF THE INDICTMENT.

{¶ 37} Under his Second Assignment of Error, Reed contends the trial court erred in failing to dismiss the two counts of having a weapon under disability.   According to Reed, those charges should have been dismissed pursuant to the Supreme Court of Ohio's decision in *State v. Hand*, 149 Ohio St.3d 94, 2016-Ohio-5504, 73 N.E.3d 448, because the predicate offenses on which those charges were based were juvenile adjudications.   Reed claims that under *Hand*, the statutory provisions governing the weapons under disability offenses, R.C. 2923.13(A)(2) and (A)(3), unconstitutionally permit a juvenile adjudication to serve as an element of the offense.   We disagree.

{¶ 38} In *Hand*, the Supreme Court ruled that it is an unconstitutional violation of due process to use a juvenile adjudication as the equivalent of an adult conviction to

enhance a penalty for a later crime, because, unlike an adult conviction, a juvenile adjudication does not involve the right to a trial by jury. *Hand* at ¶ 37-38. In so holding, the Supreme Court struck down R.C. 2901.08(A), a statute which specifically provided that a prior "adjudication as a delinquent child or as a juvenile traffic offender is a conviction for a violation of the law or ordinance for purposes of determining the offense with which the person should be charged and, if the person is convicted of or pleads guilty to an offense, the sentence to be imposed[.]" *Id*. at paragraph one of the syllabus and ¶ 9. The Supreme Court held "that R.C. 2901.08(A) violates the Due Process Clauses of Article I, Section 16 of the Ohio Constitution and the Fourteenth Amendment to the United States Constitution because it is fundamentally unfair to treat a juvenile adjudication as a previous conviction that enhances either the degree of or the sentence for a subsequent offense committed as an adult." *Id*. at ¶ 37. Accordingly, the Supreme Court of Ohio made it clear in *Hand* that "a juvenile adjudication is not a conviction of a crime and should not be treated as one." *Id*. at ¶ 38.

**{¶ 39}** Reed concedes that in *State v. McComb*, 2017-Ohio-4010, 91 N.E.3d 255 (2d Dist.), this court held that *Hand* does not apply to R.C. 2923.13(A)(2) and that the use of a juvenile adjudication to support a charge of having a weapon under disability does not violate a defendant's constitutional right to due process. Nevertheless, Reed requests we reconsider this issue, given that the Supreme Court of Ohio has accepted the issue for review in *State v. Carnes*, 150 Ohio St.3d 1429, 2017-Ohio-7567, 81 N.E.2d 1271.

**{¶ 40}** Although not released when Reed filed his appellate brief, the Supreme Court's decision in *Carnes* has since been issued and it aligns with our holding in

*McComb.* *See State v. Carnes,* 2018-Ohio-3256, ___ N.E.3d ___, ¶ 1, 21. Specifically, the Supreme Court held in *Carnes* that "a prior juvenile adjudication may be an element of the weapons-under-disability offense set forth in R.C. 2923.13(A)(2) without violating due process under the Ohio or United States Constitutions." *Id.* at ¶ 21. In so holding, the Supreme Court explained: "Contrary to 2901.08(A)—the statute struck down in *Hand*—R.C. 2923.13(A)(2) does not deem the juvenile adjudication to be an adult conviction; the juvenile adjudication is itself an element of the offense." *Id.* at ¶ 19. The Supreme Court further explained that: "R.C. 2923.13(A)(2) does not use juvenile adjudications for sentence enhancement purposes. Regardless of the predicate conduct, a violation of the statute is a third-degree felony. R.C. 2923.13(B)." *Id.* at ¶ 10. Therefore, like our decision in *McComb*, the Supreme Court of Ohio declined to extend *Hand* to R.C. 2923.13(A)(2).

**{¶ 41}** As noted above, Reed was convicted of two weapons under disability offenses, one under R.C. 2923.13(A)(2) and the other under R.C. 2923.13(A)(3). Although R.C. 2923.13(A)(3) is not explicitly discussed in *Carnes*, the same analysis applies to that charge. Like section (A)(2), section (A)(3) does not deem the juvenile adjudication to be an adult conviction, but instead makes a juvenile adjudication an element of the offense. The only difference between these two sections is that R.C. 2923.13(A)(2) involves juvenile adjudications that would be considered a felony offense of violence if committed by an adult, while R.C. 2923.13(A)(3) involves juvenile adjudications that would be considered a felony drug offense.

**{¶ 42}** Based on the Supreme Court's holding in *Carnes* and our prior holding in *McComb*, we do not find that the trial court erred in failing to dismiss Reed's two weapons

under disability charges. Therefore, we once again hold that the use of a juvenile adjudication to support a charge of having a weapon under disability does not violate a defendant's constitutional right to due process.

{¶ 43} Reed's Second Assignment of Error is overruled.


## Conclusion

{¶ 44} Having overruled both of Reed's assignments of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .


DONOVAN, J. and TUCKER, J., concur.


Copies mailed to:

Mathias H. Heck, Jr.
Andrew T. French
Andrew C. Schlueter
Hon. Steven K. Dankof